May it please the court, your honor. My name is Brett Whipple. I represent appellant Bryon Quackenbush and I request three minutes for reserve. Watch your time. Thank you so much. February 20th, 2014. My client, Bryon Quackenbush, is sitting in his house in Las Vegas, Nevada, enjoying the morning and he hears a knock on the door. He goes to the door. There's three individuals at the door. Lo and behold, he learns that they're FBI agents undercover, fully with weapons. He also learns that they're looking for his roommate. His roommate has an arrest warrant. Through some deception and some lies, the FBI agents have his roommate come to the door where he's taken into custody. Not only are there three agents at the door, there are an additional five agents at the bottom of the stairs. After they take the roommate into custody, they put my client in handcuffs and they do a cursory search of the apartment to put him in the kitchen. When they're done with that, they then take him out of handcuffs, take him into the front room and interrogate him for approximately an hour. From the time that the arrest warrant is processed to the time that my client is eventually taken into custody is approximately two, two and a half hours. Now, what my client did not know is that of those eight individuals, one of them had taken the lead in doing an investigation regarding Mr. Quackenbush. He had additional information from Michigan about potential wrongdoing and he had met and he had found specific instances of concern regarding my client. During that... His testimony was that he did not, during that questioning, believe that there was a reason to arrest your client. Isn't that correct? When he walked in the room, he did not have a basis for arresting my client. Didn't he say, not until I had that private call to the assistant U.S. attorney that I, and that was after the questioning, did I determine that I had an ability to arrest? Well, he was looking for probable cause. Yeah. And he, and once he contacted the U.S. Attorney's Office, it's because he believed he, he had probable cause and wanted authority to arrest my client. His testimony, as I recall, was that during the questioning, he did not, now this is subjective and we deal with objective tests, but it might be at least tangentially relevant from an evidence point of view. His testimony was that he did not think he had cause to arrest during the questioning. Is that correct or not? I do not agree with that. It was developed during the questioning that he found probable cause, contacted the U.S. Attorney's Office, and then arrested my client. Well, but I think what Judge Ebel is referring to is that the agent testified that he didn't think there was a crime to arrest him for until the AAUSA explained, no, you can be, you can arrest him for aiding and abetting Mr. Lively. Well, initially, when he walked in the room and started questioning my client, I'll agree with that, but it's pretty quickly, my client made admissions to him that clearly showed that he violated the law and gave him basis for probable cause. Then he got additional information, contacted the U.S. Attorney's Office and said, you know what, he can also be But clearly from the beginning, he was looking at my client, I believe, as a perpetrator of wrongdoing and was questioning him specifically to those issues. But if the district court found otherwise, we would review that for clear error, correct? I agree with that. Yeah. So we appealed this. We challenged this motion to suppress. Obviously, the most important thing that I didn't tell you is during this entire two and a half time period, my client was never issued his Moran warnings. And so we issued, we was told, number one, you're not being arrested. Number two, you don't have to answer questions. And number three, you're free to leave. I know you disputed those things, but didn't the district court make those findings a fact? So, yes. Yes or no? Yes. Yes. Okay. Thank you. And what I'm going to do is follow up on that. And if you look at Bates Stamp 175, 176, that's actually the transcript of that very issue. He said, yeah, you don't have to. You don't you're free to leave, but you're going to follow your roommate to custody if you don't talk to us. But the district court didn't agree with that. The district court chose the officer's chose Officer Boogney's statement that I didn't say you're free to follow your roommate. I just said he was free to leave. And the district court said I agree with Boogney on that. Isn't that correct? So the answer is, yes. But I believe that's error because here's the issue. At the evidential standard of reviewing a district court's error in a finding of fact. Plain error analysis. Right. And so And there is evidence from Boogney that supports the district court finding. That's what Boogney said. So you will have to argue to us that an explicit statement by a person who is there of his direct statements made is not enough, that we can still reverse the district court in the face of that evidence. So I don't disagree. But what I want to do is follow up and say at the evidentiary hearing, that was never contested. They never recalled the agent to say, hey, that's not what I said. They never called any other witnesses. They had additional witnesses there. I'm the person who did that evidentiary hearing. My client testified to that very issue, and it was never challenged on the record. Now, It seems to me with the time you have remaining, your best argument is to explain to this court why the Craighead case, why that's a good case for you, and why your case is very similar to Craighead. The government's going to get up and say it's nothing like Craighead. It seems to me you want to say it is. So why don't you spend some time on that? Sure. So Craighead is, I feel, is directly on point, because this is an issue that took place in our client's residence. You look at the Kim factors, one of the factors is where the presence was. And that's extended to Craighead. And Craighead says, you know what, even though it's in a person's house, that is, we believe, creates a heightened issue, a heightened sense. Because when they tell you you can leave, where do you go? When you are home and you're told you can go, where do you go? As the folks here in this jurisdiction previously said, do you go to the police office? Do you go to the police station? I mean, when you are in your house, that is fundamentally a protected location. And so what Craighead deals is, deals directly with that very issue. There are four factors, as this Court is aware, under Craighead. And I believe the first three of them are uncontested, that, in fact, the government violated him. The only issue is the fourth factor, which is whether he was told he was free to leave or not, and that's why I addressed that as I did. I think that is important, and that's what I wanted to point out on the evidentiary in the hearing itself, that the court or the government had opportunity to respond to that very issue. So Craighead is on point. Of the four factors, three are found by the court to say that they violated my client's constitutional protection. The only issue is the fourth issue, which is whether he actually was told he's free to leave, and that's why I direct the court to, you know, Bate Stamp 175 and 176, because it goes on to explain what occurred during that communication. And I take it you would argue that in Craighead, Mr. Craighead was told he was free to leave. He was. And yet this court still found that he was under, in custody for Miranda purposes. Absolutely. And in Craighead, he was never put into handcuffs. And he actually was summoned to the court at a later date. In my situation, my time, he was taken by hand into a different room, he was interrogated, and then he was arrested and taken directly to the detention center. So the fact of the matter is, when the officers arrived at the front door, it was a ruse. They had lied essentially to these folks, saying to them that they were looking for another person. That's   how they found my client's name, and that's how the roommate came to the door and gave his name, and he was arrested. At the time they arrested the roommate, that is when they put both of them into handcuffs and searched the entire apartment for officer safety. That search took place, took approximately three to four minutes. My client was in the kitchen at that time. They then, two of the eight officers then took the roommate to the detention center. Five of them approximately stayed at the apartment complex. At that point, they took the cuffs off my client and led him into the front room, where they then interrogated him and questioned him. And so our position is, because this is at home, there's additional scrutiny. In custody. Exactly. I have two minutes remaining if I can. I appreciate you, Your Honor. May it please the court, Bill Reed for the United States. After the FBI agent and the defendant testified at an evidentiary hearing, the magistrate judge correctly concluded that the agent was not required to provide Miranda warnings for an interview that took place in the living room of the defendant's residence. The magistrate judge Lane also found that no reasonable innocent person would have believed they were in custody where the agent sat down on a milk crate next to the defendant in the living room after asking him if he was willing to answer some questions, told him he was free to leave, that he was not under arrest, and also told him that it would not hurt his feelings if he didn't want to talk to him. This case is readily distinguishable from Craighead. As the district court found in this case, after the magistrate judge issued her report and recommendation, the district judge didn't just summarily affirm her report and recommendation. The district court undertook the Craighead analysis and found that the circumstances in Craighead were much more in the case involving this defendant. And those factors in Craighead involved primarily, as this court found, multiple law enforcement agencies present in the defendant's residence when he was interviewed. And that kept the defendant or prevented the defendant in Craighead from understanding or from being able to accept the authority of the agent who told Mr. Craighead. Is there any evidence that this defendant knew about all the other agents outside the house? Your Honor, there were quite a few agents out there. There were a total of eight agents, just as in Craighead. The record's not clear as to whether he knew how many were below the stairs versus in the apartment. Certainly, he saw multiple agents. Agents came and left. But by the time the interview took place, it was clear that the situation was dialing down or de-escalating. Half the agents had left by that time. There were only four agents by both accounts, the defendant's and the FBI agent's account. Do you think a defendant would really feel more free to leave because there's only four agents guarding one man without any weapons versus eight or ten or a thousand? I mean, at some point, don't you have enough agents so that does it really make a person feel freer to leave with only four people around? That factor in and of itself, Your Honor, is not controlling. That is a factor. The test is a totality of the circumstances under a reasonable, innocent person's point of view, not just this defendant's point of view or not this defendant's point of view. And in this case, in addition to the number of agents that had decreased by the time the interview took place, he'd been told that he was not under arrest, that he was free to leave, and it wouldn't hurt the agent's feeling if he didn't even want to talk to him. So under a totality of the circumstances, including the number of agents diminishing or decreasing there in the residence, the magistrate judge correctly concluded that a reasonable, innocent person would not have felt that they were in custody. Well, the suggestion made this morning, and I think running through the brief a little bit by the appellant, is that this was all a ruse, that they were out to get him. And from the facts, I gather that the primary object of their coming to the house in the first place with all these people was to get the roommate? Is that correct? Yes, Your Honor. There was considerable evidence that the agent . . . Well, the evidence was that there was an arrest warrant for the defendant's roommate, and there's considerable evidence that the agent, Agent Boogney, knew very little about this underlying Michigan investigation. And the magistrate judge, Lane, accredited that view of things, and that is entitled to deference by this court under a clear error standard of review. So they had an arrest warrant for the roommate, but they didn't have any for him? Yes, Your Honor, that's correct. And it was after the roommate had left that all of this happened with respect to questioning the appellant? Is that correct? That's correct. Agent Boogney testified that no questioning took place until after Mr. Lively had been arrested and removed from the scene. And the record shows that the agent was perhaps taken aback by the defendant's forthcoming about this matter, that the agent was going to question the defendant, but that he was really taken aback by how forthcoming he was. Well, he wasn't 100 percent forthcoming. I mean, one of the questions is whether the agent takes an accusatory stance, and it wasn't until the agent said, look, we know about your trip to Michigan, that he kind of changed his position on that. So he wasn't all that forthcoming about Michigan. That is correct that the defendant did not initially, that he denied initially ever having been in the state of Michigan, but the agent merely told him that I know about a report where another law enforcement officer had encountered you with a minor child in Michigan, and the defendant immediately said, oh, you know about that, and then began to gush toward you. And that certainly has an accusatory sting to it. I mean, it may not be quite the same as saying we've got some secret informant that said you committed some crime, but certainly it wouldn't have been a cause of comfort and succor for this defendant to be told that they knew he had been in Michigan. Yes, Your Honor, he did confront, the agent did confront the defendant with his knowledge that he had been in Michigan, but that was the extent of it. He didn't accuse him of any specific criminal activity, and one single incident, this Court has found, has said that one single isolated incident of a confrontational aspect to an interview is not enough to find that the entire interaction was a heightened confrontation between the agent and a defendant. Here the magistrate judge found that this was a low-key interview, that the agent never raised his voice, there was no yelling or anything of that nature. The agents weren't dressed in tactical or raid gear as they were in the Craighead case. They were wearing khakis and shirts. Their firearms were concealed. They were never unholstered as they were in Craighead. And most significantly, as opposed to the facts in Craighead, the defendant was interviewed in the familiar surroundings of his living room, as opposed to the defendant in Craighead where he was taken back to a storage shed and the door was closed. Yeah, but that's what's so odd about these cases. It's really very odd to think, to have a standard of you're free to go when the fellow is in his own house. I think that's what is a little bit troubling in these cases. Your Honor, perhaps it would have been a better practice if the agent had said to the defendant, if you'd like for us to leave, I will leave. You're free to go. We will leave rather than you're free to go. However, the defendant didn't challenge that language in the court below or in his appeal. And I was going to say, I'm not even sure that's accurate because if they're still executing a warrant, let's say they're doing a computer download, that could take hours. And the agents would still need to remain in the apartment. So I'm not sure the agents could necessarily say, if you want us to leave, we'll leave, because they actually have a warrant from a judge saying they can be there searching the premises. Your Honor, under Your Honor's hypothetical, that is correct. But in this case, they did not have the search warrant until after they had interviewed the defendant and he had made some admissions about the particular computer. So they had authority to be there for the arrest of the roommate. But in any event, the agent's words to the defendant were the functional equivalent of we'll leave if you want us to when he asked him if he was willing to answer some questions and told him you're not going to hurt our feelings if you don't want to talk to us and you're not under arrest. And I thought the record in this case did reflect that. He said, as you just said, you don't have to talk to us if you don't want to. That's correct. I believe the agent testified. Hurt my feelings. You're not going to hurt my feelings if you don't want to talk to us, which I think those words, the exact words are important in this case because that would communicate to a reasonable person that they don't have to talk to the agent. They're not in custody. It depends on the tone. It would depend on the tone. And the magistrate judge found that this was a low key, as the agent testified. I see my time is evaporating unless there are any other questions I've submitted to the court. Thank you very much. Thank you. Mr. Quackenbush was in handcuffs in the kitchen. He was released. He was then escorted by hand into the front room. There were approximately four to five officers surrounding him. In his testimony on page 173, he said there were at least three people between him and the door. He made he mentioned on page 173 that he made reference to the fact he'd like to leave and their body language changed. And in his opinion, he couldn't leave. The court said that that was very ambiguous. The court said that there wasn't enough detail about what the response was, who was agitated, and the court felt there simply wasn't enough particularity on that one. Isn't that correct? The court did not hold the court did not agree with our position on that particular factor. Because the court said the allegations weren't specific enough to advance that argument. So I agree with that. But if you look at, and that's why I direct this court, pages 173 to 176, where my client specifically testified to those very issues and was not contested by the government thereafter, I think that has merit and has weight and something that should be reviewed. At the end of the day, I do believe a reasonable, innocent person would have felt they could not leave because of the factors that they were facing, the number of people, the way they were escorted, the fact that they had been in handcuffs, the fact that there were a number of people between them and the door, and the fact that they had no place else to go. That was their home. When you go search for safety, you go home. And when you're home, where do you go from thereafter? And that is the holding, obviously, that this court is looking towards. I appreciate very much the opportunity to present these facts to this court, and I'm available for a few seconds of questions. We're good. Thank you so much. Thank you. Thank you to both counsel for the argument. This matter is submitted.
judges: Ebel, Schroeder, Owens